```
_____ FILED        _____ ENTERED
_____ LODGED       _____ RECEIVED

         OCT 23 2014
            AT SEATTLE
        CLERK U.S. DISTRICT COURT
    WESTERN DISTRICT OF WASHINGTON
BY                            DEPUTY
```

Judge James P. Donohue

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>PAUL AHRENS<br><br>Defendant. | NO. **MJ 14-420**<br><br>COMPLAINT for VIOLATION<br><br>Title 18 United States Code, Section 1365(a) |

BEFORE the Honorable James P. Donohue, United States Magistrate Judge, United States Courthouse, Seattle, Washington.

## COUNT 1

### (Tampering with Consumer Products)

On a date unknown, but during the period between on or about October 1, 2013 and November 24, 2013, in King County, within the Western District of Washington, the defendant, PAUL AHRENS, with reckless disregard for the risk that another person would be placed in danger of death or bodily injury, and under circumstances manifesting extreme indifference to such risk, did tamper with a consumer product that affected interstate and foreign commerce, specifically morphine, a substance controlled under Schedule II, Title 21, United States Code, Section 812, and with the labeling of and

Complaint/United States v. Ahrens - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

container for such product, by opening vials labeled as containing morphine, a narcotic painkiller in liquid form, removing some or all of the morphine, and replacing the morphine with a liquid similar in appearance.

All in violation of Title 18, United States Code, Section 1365(a).

## COUNT 2

### (Tampering with Consumer Products)

On a date unknown, but during the period between on or about October 1, 2013 and November 24, 2013, in King County, within the Western District of Washington, the defendant, PAUL AHRENS, with reckless disregard for the risk that another person would be placed in danger of death or bodily injury, and under circumstances manifesting extreme indifference to such risk, did tamper with a consumer product that affected interstate and foreign commerce, specifically lorazepam, a substance controlled under Schedule IV, Title 21, United States Code, Section 812, and with the labeling of and container for such product, by opening vials labeled as containing lorazepam, a sedative in liquid form, removing some or all of the lorazepam, and replacing the lorazepam with a liquid similar in appearance.

All in violation of Title 18, United States Code, Section 1365(a).

## COUNT 3

### (Tampering with Consumer Products)

On a date unknown, but during the period between on or about October 1, 2013 and November 24, 2013, in King County, within the Western District of Washington, the defendant, PAUL AHRENS, with reckless disregard for the risk that another person would be placed in danger of death or bodily injury, and under circumstances manifesting extreme indifference to such risk, did tamper with a consumer product that affected interstate and foreign commerce, specifically midazolam, a substance controlled under Schedule IV, Title 21, United States Code, Section 812, and with the labeling of and container for such product, by opening vials labeled as containing midazolam, a sedative

in liquid form, removing some or all of the midazolam, and replacing the midazolam with a liquid similar in appearance.

All in violation of Title 18, United States Code, Section 1365(a).

I, JASON SHERRELL, being first duly sworn on oath depose and say:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent for the United States Department of Justice, Drug Enforcement Administration (DEA) and am currently assigned to the Seattle Field Division. I have been a Special Agent for approximately seventeen years. I have received more than 700 hours of comprehensive classroom training from DEA in specialized drug investigative matters including, but not limited to, drug interdiction, drug detection and identification, money laundering techniques, locating hidden assets derived from drug trafficking, and the investigation of individuals involved in the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. I have also received specialized training regarding the diversion of pharmaceutical controlled substances. I have participated in and conducted investigations of violations of various State and Federal criminal laws, including unlawful possession with intent to distribute controlled substances, use of a communication facility to further controlled substance offenses, importation of controlled substances and listed chemicals, conspiracy to import, possess, and distribute controlled substances, diversion of controlled substances, and tampering with consumer products.

2. I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based on discussions and information provided to me by other federal, state, and local law enforcement agencies. Because the purpose of this affidavit is limited to setting forth probable cause, this affidavit does not include every fact known to me concerning this investigation.

3. The affidavit is submitted in support of an arrest warrant for Paul Ahrens, former paramedic with South King County Medic One. Based upon the information set

forth below, I submit that there is probable cause to believe that Ahrens committed the crime of Tampering with a Consumer Product, in violation of 18 USC § 1365(a).

## II. THE INVESTIGATION

4. South King County Medic One is a public service organization providing advanced emergency patient care to South King County residents using specially equipped medic units (ambulances). South King County Medic One paramedics are trained by the University of Washington, Harborview Medical Center, and Seattle Fire Department paramedic training program to use an extensive array of emergency medication, equipment and procedures. The Medic One paramedics are stationed with their ambulances for 24 hour shifts in eight locations (stations) throughout South King County. For identification purposes, each station is numbered. For example, Medic 4 refers to the station in Seatac, Medic 6 the station in Auburn, and Medic 12 the station in Enumclaw. The paramedics are supervised by a field Medical Service Officer, also known as MSO1, that is staffed 24/7 and physically located in Des Moines. Additional administrative Medical Service Officers responsible for overall management of specific programs or areas, such as operations, training or quality assurance, and are staffed Monday through Friday at the Medic One Headquarters. These administrative Medical Service Officers are assigned the identifications of MSO2, MSO3, MSO4, and MSO10.

5. The Medic One units carry a wide range of medications necessary for the treatment of medical emergencies, including morphine, which is a pain relief medication. The morphine is contained in a vial with rubber top to allow a syringe to be inserted. The rubber top is covered by a hard plastic cover, which protects the vial until the medication is needed for use. Morphine is a Schedule II Controlled Substance.

6. All of the controlled substances stocked in the ambulances are in a locked safe in the ambulance that requires a code to unlock it. All of the Medic One paramedics have the code to unlock the drug safe. The paramedics work a twenty-four hour shift and are two-paramedic crews. When one crew is coming on duty they check in with the current on-duty crew. Both crews then together go through the stock of drugs on the

ambulances. A full accounting of all controlled substances is made by the on-coming and off-going crews. Paramedics are provided with, and wear, Medic One jackets during the course of their duties. The jackets are typically left at the Medic One station at the end of each shift, in lockers that are assigned to each Medic One paramedic for the duration of their assignment to any particular Medic One station.

7. When paramedics notice that the plastic protective cap has come off a medication, or is missing, they are required to set aside the medication, notify a supervisor, and write up the incident. South King County Medic One Chief John Herbert reported that in some cases the top accidentally comes off but this is not a common situation. Once the plastic protective cap has been taken off the medication it cannot be put back on manually.

8. MSO3 Don Cloyd is a supervisor with South King County Medic One who supervises the use of controlled medications in the Medic One units. MSO3 Don Cloyd is notified by paramedics when there is an issue with controlled medications. Around November 12, 2013, Dr. Rae, the Medical Director for South King County Medic One, was notified by MSO3 Don Cloyd that he had received four vials of morphine where the plastic protective cap had come off. On November 20, 2013, paramedics provided two further vials of morphine to MSO3 Don Cloyd with the plastic protective caps off.

9. Chief Herbert, who is the chief executive officer responsible for the overall administration of the South King County Medic One program, reported that it is normal for one to two vials of medications to be turned in each month where the plastic protective caps have come off, but having seven in one month was odd, as what happened in November 2013. Chief Herbert also reported that it was very odd to have the same drug (morphine) turned in with the plastic protective caps off.

10. On Thursday, November 21, 2013, Dr. Rae took the two vials of Morphine that were turned in on November 20, 2013, to be tested at Harborview Medical Center. Dr. Rae also took an intact vial of morphine to be tested. On Friday, November 22, 2013, the test results came back. The two vials that were missing the plastic protective

caps had puncture holes in the rubber tops of the vials and did not contain morphine when tested. The first vial's contents had been replaced with the drugs Phenergan and Benadryl and the other vial's contents had been replaced with the drug Etomidate. The intact morphine vial did contain morphine.

11. Chief Herbert was informed of the test results on Friday, November 22, 2013, around 1:00pm. Chief Herbert started an internal investigation. Chief Herbert and other Medical Service Officers (MSO) went to all of the stations of South King County Medic One and exchanged all of the morphine with new morphine. While replacing the morphine, an MSO found a vial of morphine that the plastic protective cap did not twist like it should. The plastic protective cap just popped off. Chief Herbert reported that it appeared that the plastic protective cap was glued on. Chief Herbert notified the King County Police of the suspected diversion and tampering.

12. During the course of the investigation, South King County Medic One looked up the usage pattern of the morphine. South King County Medic One keeps records on paramedic usage of controlled drugs. When they notice that there is an increase with a paramedic usage that does not coincide with the paramedic changing to working at a busy station they look for signs of atypical behavior by the paramedic. South King County Medic One also does a general audit of medications. They trace the medication from its origin from the pharmacy through the truck (ambulance) to the patient and make sure that everything has been documented correctly.

13. The South King County Medic One investigation looked at the usage pattern and also identified who had access to the tampered vials of morphine. South King County Medic One identified Paul Ahrens and A.T. (a Medic One paramedic and back up MSO) due to the fact they were at Medic 12 in Enumclaw where one of the vials of morphine was discovered. The investigation demonstrated that the morphine vial was intact at the start of the shift and then it had been tampered with by the end of the shift. In tracking the paramedics with access to the tampered vials of morphine, Paul Ahrens was either working in a certain Medic One station the day of, or the day before

when vials of morphine were turned in because the fact the plastic protective cap had been off.

14. South King County Medic One also keeps back-up kits at the stations. The back-up kits contain three vials of morphine which are rarely used. The back-up kits are only checked weekly on Thursdays. As part of the internal investigation in November 2013, South King County Medic One found morphine vials in the back-up kits that were missing their plastic protective caps. They checked the work logs and identified that Paul Ahrens was either there the day of, the day before, or sometime during the prior week from when the tampered morphine vials in the back up kits were discovered.

15. Chief Herbert also reported an incident that Paul Ahrens' Medic One partner, A.T., had reported in November of 2013. A.T. told his supervisor that when A.T. arrived at work for the drug exchange the plastic protective caps were intact. But when A.T. examined the vials the following morning just prior to the hand over to the oncoming crew, there were two vials of morphine that had plastic protective caps which were off and there appeared to be puncture marks in the rubber of the vials. A.T. asked Paul Ahrens about the vials and Paul Ahrens told A.T. that it was no big deal that the plastic protective caps were off. A.T. wrote an incident report regarding the incident.

16. The vials of morphine that were missing their plastic protective caps came from the SeaTac, Federal Way, Auburn and Enumclaw stations. In total, the investigation revealed nine vials of morphine with the plastic caps off. I was able to obtain and test suspect vials from the Seatac (Medic 4), Auburn (Medic 6), and Enumclaw (Medic 12) stations.

17. As the chief executive officer responsible for the Medic One program, Chief John Herbert is also the final authority for any disciplinary actions imposed on his employees. In addition to being a field supervisor for Paul Ahrens and the other paramedics, MSO1 Chris Merritt is their union representative.

18. On Sunday, November 24, 2013, Chief Herbert, MSO1 Keith Keller (Ahren's immediate supervisor for the day), and MSO1 Chris Merritt (in his union

representative capacity) spoke with Paul Ahrens. At the time Paul Ahrens was working at the Medic 6 station in Auburn. Chief Herbert confronted Paul Ahrens about the tampered vials. Paul Ahrens denied any involvement. Approximately twenty minutes later, Paul Ahrens called Chief Herbert and MSO1 Chris Merritt requesting a meeting. They agreed to meet Paul Ahrens at a Denny's restaurant. MSO1 Merritt arrived first, went inside, and contacted Paul Ahrens, who was pale, sweaty and very distraught in appearance. Paul Ahrens apologized to MSO1 Merritt for lying and stated that he was responsible for the tampered vials. MSO1 Merritt asked Paul Ahrens to go to his vehicle with him. Paul Ahrens apologized further and told MSO1 Merritt that he had substituted saline or something in the morphine vials to make it look like the morphine was still there. Chief Herbert arrived and Chief Herbert, Paul Ahrens and MSO1 Merritt went back to the Medic One station in Auburn. Paul Ahrens repeated his statement about being responsible for the tampered vials and missing morphine to Chief Herbert. He stated that he was responsible for the diversions at the Medic 4, Medic 6, and Medic 12 stations. After the conversation, Paul Ahrens s went home for the day. He also made arrangements to go into drug rehabilitation and be off work for an extended period of time.

## Specific Diversions

A.  **Diversion One**

   19.   On or about November 5, 2013, Ahrens worked a 24 hour shift beginning at 9:00 a.m. at the Medic 4 station in Seatac, Washington. During this shift, Ahrens' partner observed him go into the room where the station's backup medical kit was stored and close the door. The partner stated that this was uncommon but thought Ahrens was making a personal call.

   20.   On November 22, 2013, due to concerns of possible tampering, Medic One management pulled morphine vials from every Medic One station and replaced them with new stock. The pulled vials were labeled by location and later turned over to the King County Police and ultimately the Drug Enforcement Administration. While

examining the morphine vials pulled from Medic 4, management found one vial in particular whose cap did not twist freely as expected and "popped" off. Management observed a small translucent material that appeared to be dried glue with corresponding marks on the inside vial cap. Management believed that the cap had been removed and glued back on to the vial. The DEA laboratory tested the suspect vial and determined that its morphine concentration was significantly less than expected per the label. The exact concentration could not be determined due to the low concentration, but was estimated to be at least 10 times lower than the amount specified on the label. The lab result suggests that the morphine vial was diluted with an unknown contaminant. In the interview with Chief Herbert and MSO1 Merritt on November 24, 2013, described above, Ahrens admitted that he tampered with the morphine vials at the Medic 4 station.

21. I believe that Ahrens took the morphine vial from the Medic 4 stock, withdrew a portion of the morphine for personal use, injected an unknown liquid back into the vial and glued the cap on to conceal his theft, and placed the tampered vial back into the Medic 4 stock with a conscious or deliberate indifference to risk with regard to potential harm to patients.

**B. Diversion Two**

22. On or about November 7, 2013, Ahrens worked a 24 hour shift beginning at 9:00 a.m. at the Medic 6 station in Auburn, Washington. Ahrens conducted the end-of-shift audit and initialed that all medications were intact. Ahrens' partner was preparing for a family road trip and did not witness the count, as required by Medic One procedures. Four hours later, the next shift conducted a start-of-shift count of the medications and discovered two vials of morphine with their caps off. The paramedics notified Medic One management of their discovery who responded to the station and removed the morphine vials from stock, per policy.

23. The pulled vials were later turned over to the King County Police and ultimately the Drug Enforcement Administration. The DEA laboratory concluded that the vials contained Etomidate and morphine. Etomidate is a short-acting sedative used

by Medic One paramedics. I contacted the manufacturer of the morphine vials and confirmed that Etomidate was not included in the ingredients. In other words, Etomidate was a foreign contaminate in the morphine vials.

24. In the interview with Chief Herbert and MSO1 Merritt on November 24, 2013, described above, Ahrens admitted that he tampered with the morphine vials at the Medic 6 station.

25. I believe that Ahrens took the morphine vials from the Medic 6 stock, withdrew a portion of the morphine for personal use, injected Etomidate back into the vial to conceal his theft, and placed the tampered vials back into the Medic 6 stock with a conscious or deliberate indifference to risk with regard to potential harm to patients.

### C. Diversion Three

26. On or about November 11, 2013, Ahrens worked a 24 hour shift beginning at 9:00 a.m. at the Medic 12 station in Enumclaw, Washington. On or about November 17, 2013, Medic One management responded to the station to retrieve a morphine vial whose cap had come off. The vial was later turned over to the King County Police and ultimately the Drug Enforcement Administration. The DEA laboratory tested the suspect vial and determined that its morphine concentration was significantly less than expected per the label. The exact concentration could not be determined due to the low concentration, but was estimated to be at least 10 times lower than the amount specified on the label. The lab result suggests that the morphine vial was diluted with an unknown contaminant.

27. In the interview with Chief Herbert and MSO1 Merritt on November 24, 2013, described above, Ahrens admitted that he tampered with the morphine vials at the Medic 12 station.

28. I believe that Ahrens took the morphine vial from the Medic 12 stock, withdrew a portion of the morphine for personal use, injected an unknown liquid back into the vial to conceal his theft, and placed the tampered vial back into the Medic 12

stock with a conscious or deliberate indifference to risk with regard to potential harm to patients.

**D.     Diversion Four**

29.    On or about November 19, 2013, Ahrens worked a 24 hour shift beginning at 9:00 a.m. at the Medic 12 station in Enumclaw, Washington, with a 30 year veteran paramedic and back up MSO1, A.T. At about 5:00pm that night, Ahrens and A.T. were dispatched to a call from a nearby nursing home. They had just been there earlier in their shift. A.T. waited for Ahrens in the ambulance for a long time before Ahrens showed up and asked where they were going. A.T. thought Ahrens was just messing with him when Ahrens asked A.T. for turn by turn instructions to return to the nursing home they were just at. At the end of the call, Ahrens appeared distracted and drove the ambulance into tree branches and hedge bushes alongside the road. Ahrens did not appear to notice he was hitting anything.

30.    After returning to the station around 6:00 p.m., A.T. thought Ahrens could be under the influence of alcohol because of his behavior navigating and driving the Medic One ambulance. A.T. got very close to Ahrens and asked him if he had been drinking. A.T. could not smell any alcohol and Ahrens was not slurring his speech. A.T. worked on MSO1 training required by Medic One and did not pay much attention to Ahrens the rest of the night. A.T. did notice that when Ahrens got onto the treadmill for the first time due to the noise. Ahrens was taking exaggerated steps and hitting the front of the treadmill as he was running. A.T. complained about the level of noise and Ahrens then decided to alter the swing direction of the dryer door for an unknown reason.

31.    A.T. went to bed at 10:00 p.m. that night, and there were no calls the rest of the night. When A.T. awoke at 6:00 a.m. he found a bloodied paper towel in the bathroom trash. A.T. noted that the amount of blood and shape of the stain was more consistent with a vein puncture and not a nose bleed. Only Ahrens and A.T. used that bathroom.

32. A.T. decided to check on the narcotic supply in the ambulance and found a bundle of three morphine vials, with two of them missing their caps. A.T. knew that there was no reason for either of them to have accessed the narcotics supply since the start-of-shift audit because they had not treated any patients with medications. One of the vials showed obvious signs of tampering (needle marks). A.T. contacted Medic One management to report the finding. Before management and the next crew arrived, Ahrens came out and asked what was going on. A.T. showed Ahrens the needle marks and Ahrens causally commented that it just looked like a scratch. Ahrens then left.

33. A supervisor arrived shortly thereafter and took custody of the two morphine vials. Medic One management took the two vials to the University of Washington for testing. One vial was found to contain Etomidate and the second contained Phenergan and Benadryl. All three substances were foreign contaminants in the morphine. In the interview with Chief Herbert and MSO1 Merritt on November 24, 2013, described above, Ahrens admitted that he tampered with the morphine vials at the Medic 12 station.

34. I believe that Ahrens took the morphine vials from the Medic 12 stock, withdrew all of the morphine for personal use, injected Etomidate back into one vial and Phenergan and Benadryl into the other to conceal his theft, and placed the tampered vials back into the Medic 12 stock with a conscious or deliberate indifference to risk with regard to potential harm to patients.

35. Diversions 1-4 form the bases for Count 1.

E. **Diversion Five**

36. On November 25, 2013, during the shift change audit at Medic 12, a vial of lorazepam, also known as Ativan ®, was found missing its cap. Lorazepam is a Schedule IV benzodiazepine used to treat anxiety and seizures as well as sedate aggressive patients. The focus of the internal investigation had been on the morphine vials, so this suspect vial had gone unnoticed in prior audits. A Medic One supervisor responded to the station and took possession of the suspect vial. The vial was later

turned over to the King County Police and ultimately the Drug Enforcement Administration. The DEA laboratory tested the suspect vial and determined that it contained Etomidate and no detectible amount of lorazepam.

37. I believe that Ahrens took the lorazepam vial from the Medic 12 stock during his last shift on November 19, 2013, withdrew all of the lorazepam for personal use, injected Etomidate back into the vial to conceal his theft, and placed the tampered vial back into the Medic 12 stock with a conscious or deliberate indifference to risk with regard to potential harm to patients.

38. These facts form the bases for Count 2.

**F.   Diversion Six**

39. On November 26, 2013, during the shift audit at Medic 12, a vial of midazolam, also known as Versed ®, was found missing its cap. Midazolam is a Schedule IV benzodiazepine used to treat seizures as well as induce sedation and amnesia before medical procedures. The focus of the internal investigation had been on the morphine vials, so this suspect vial had gone unnoticed in prior audits. A Medic One supervisor responded to the station and took possession of the suspect vial. The vial was later turned over to the King County Police and ultimately the Drug Enforcement Administration.

40. The DEA laboratory tested the suspect vial and determined that it contained Etomidate and midazolam.

41. I believe that Ahrens took the midazolam vial from the Medic 12 stock during his last shift on November 19, 2013, withdrew a portion of the midazolam for personal use, injected Etomidate back into the vial to conceal his theft, and placed the tampered vial back into the Medic 12 stock with a conscious or deliberate indifference to risk with regard to potential harm to patients. Following this discovery, Medic One management replaced all lorazepam and midazolam stock vials.

42. Ahrens' erratic behavior on November 19, 2013, as reported by his partner A.T., and as described above, would be consistent with using sedatives such as lorazepam and midazolam.

43. These facts form the bases for Count 3.

44. The morphine and lorazepam vials described above were manufactured by West-Wards Labs, Eatontown, New Jersey. The midazolam vials described above were manufactured by Hospira, Inc., Lake Forest, Illinois. All three controlled substances crossed state lines before they were stocked in the Medic One ambulances and medical back-up kits in the Western District of Washington. As a result of the discovery of Ahrens' tampering, Medic One management removed all the morphine, lorazepam, and midazolam vials from all the Medic One units and replaced them with new vials of controlled substances that were purchased and transported from the companies in New Jersey (morphine and lorazepam vials) and Illinois (midazolam vials) to King County, in the Western District of Washington.

### Ahrens' Medic One Jacket

45. On November 26, 2013, Chief Herbert went to the Medic 12 station, in Enumclaw, Washington, to clean out Ahrens' locker. Medic 12 is the station that Ahrens was assigned to for the month of November 2013. Chief Herbert reported that Ahrens didn't take his Medic One jacket from the Medic One unit. Medic One Jackets are worn by Medic One paramedics while on duty and contain pockets where items can be stored during duty hours. The jackets are assigned to one Medic One paramedic and have the name of the Medic One paramedic plainly visible in large letters on the jacket. The jacket had the name "Ahrens" printed in large letters and had Medic One patches on it.

46. Ahrens' jacket was left hanging in the bay area of Medic 12. Paramedics are typically assigned a locker at the station where they are assigned for the month. Medic One paramedic M.T. was moving Ahrens' jacket which was located in the bay area of the Medic 12 station when he saw a large bulge in the jacket pocket. Medic One

paramedic M.T. and his colleague, M.N., looked inside the pocket and saw various items. M.T and M.N. informed Chief Herbert that he needed to look in Ahrens' Medic One jacket, which he did. Chief Herbert took possession of the jacket and transported it to the South King County Medic One headquarters.

47. Chief Herbert emptied the contents from the right front pocket of the jacket on to a table and put the items in a plastic bag. All of the items were placed in a safe along with the jacket.

48. On January 31, 2014, I obtained a Federal Search warrant for the jacket and its contents from United States Magistrate Judge James P. Donohue. The contents of the jacket included 21 gauge and 25 gauge hypodermic needles, two 1cc syringes with wrappers, two empty syringe wrappers, and a used paper napkin. The DEA laboratory found traces of Etomidate on the opened syringe. Etomidate was also found in the tampered morphine, midazolam, and lorazepam vials as described above.

49. On February 12, 2014, I interviewed King County Medic One paramedic T.S. who stated that hypodermic syringes would be an unusual, though not unheard of, method to draw and administer medication during the course of a Medic One's duties in treating a patient on a moving Medic One truck. T.S. stated that the standard procedure would be to draw up the medication with a blunt needle, remove the needle, and attach the syringe to an installed intravenous line for administration. T.S. stated that this method protected the paramedic from accidentally sticking themselves with a hypodermic needle while trying to insert the needle into the medication vial while the truck was moving. I also observed the same (empty) syringe wrappers found in Ahrens Medic One jacket on the Medic One truck at the Enumclaw station. They contained pre-loaded, sterile saline solution. T.S. stated that these pre-loaded, saline syringes are commonly stocked on the Medic One trucks and were used to dilute intravenous medications prior to administering.


### Ahrens' Locker Contents

50.   On November 26, 2013, Chief Herbert went to the Medic 12 station in Enumclaw, Washington, to clean out Ahrens' locker. Medic 12 is the station that Ahrens was assigned to for the month of November 2013. Chief Herbert reported that he emptied the contents of Ahrens' locker. The locker contents were placed in a sealed box, and were not examined.

51.   On February 18, 2014, I obtained the sealed box containing the locker contents from Chief Herbert and placed it in the evidence room of the DEA Offices in Seattle. On March 3, 2014, I obtained a federal search warrant for the Locker Contents from Magistrate Judge Mary Alice Theiler. On March 3, 2014, I searched the Locker Contents and found a new, unopened, 25 gauge hypodermic needle in the front pocket of a white, short sleeve, button up shirt with King County Medic One patches on the sleeves. I also found an empty plastic cap that I recognized as the protective cover for a hypodermic needle.

### Conscious or Deliberate Indifference to Risk

52.   On September 12, 2014, an investigator pharmacist with the Washington Board of Pharmacy related the following information to me when asked about the potential dangers of tampering morphine with Etomidate. He informed me that all the effects would be adverse and the severity would not only depend on the condition that is causing the pain, but also the amount of drug received by the patient, the size of the patient, the compatibility of the two drugs in the same vial, the sterility of the tampered product after tampering, and the patient's drug allergies.

53.   Etomidate is a sedative, not an opioid, and has no analgesic (pain killing) activity. Its duration of action is very short, approximately 3-5 minutes. The patient would most likely become unconscious first, and then re-awake in pain.

54.   Etomidate is a weight-based drug, so if a child received an unknown adult dose they might stop breathing and die. Further, a patient could be severely allergic to the drug, resulting in anaphylactic shock if Etomidate was unknowingly administered.

The vial could also be dirty from the tampering, which could result in a serious bacterial infection, or worse, a viral infection such as hepatitis.

55. Finally, further unknown adverse effects could occur if tampered Etomidate was administered instead of morphine because Etomidate has not been studied for compatibility with morphine in the same syringe.

56. I also know from my own training and experience that patients receiving a tampered dose of morphine would continue to experience pain and be at risk of an accidental overdose. This could occur when a patient was administered a tampered dose of morphine containing little or no actual morphine and arrived at the hospital still in pain. Hospital staff may conclude that the patient has a tolerance to morphine and administer a higher (supposed) second dose to control the pain, resulting in overdose.

## IV. CONCLUSION

57. Based on the foregoing, I believe there is probable cause that Paul Ahrens committed the crime of Tampering with a Consumer Product, in violation of 18 USC § 1365(a).

Dated this 23rd day of October, 2014.

Jason Sherrell, Affiant
Special Agent
DEA

SUBSCRIBED and SWORN to before me this 23rd day of October, 2014.

JAMES P. DONOHUE
United States Magistrate Judge